J-A13041-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.H. JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 276 EDA 2021 |

Appeal from the Order Entered January 25, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000484-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: A.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.H. JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 277 EDA 2021 |

Appeal from the Order Entered January 25, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002258-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: B.L.H. JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.H. JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 278 EDA 2021 |

Appeal from the Order Entered January 25, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000483-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: B.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-A13041-21

APPEAL OF: B.H. JR., FATHER

:
:
:
:
:
:
:

:　　No. 279 EDA 2021

Appeal from the Order Entered January 25, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002257-2016

BEFORE:　BENDER, P.J.E., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:　　　　**FILED SEPTEMBER 16, 2021**

Appellant, B.H., Jr. ("Father"), files these consolidated appeals from the decrees dated and entered January 25, 2021, in the Philadelphia County Court of Common Pleas, granting the petitions of the Philadelphia Department of Human Services ("DHS") to involuntarily terminate Father's parental rights to his minor, male child, B.L.H., Jr., a/k/a B.H., born in April 2011, and his minor, female child, A.A.H. a/k/a A.H., born in April 2012 (collectively, "the Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).  Father further appeals from the orders dated and entered January 25, 2021, changing the Children's permanent placement goals to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[1]  After review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] The court additionally terminated the parental rights of the Children's mother, N.B. ("Mother"), as well as Unknown Father, by separate decrees also
*(Footnote Continued Next Page)*

- 2 -

The Children most recently became known to DHS due to allegations of lack of supervision and care and control in 2016.[2]  After the provision of services, the Children were adjudicated dependent on January 31, 2017, and placed with their maternal grandmother, A.B. ("Maternal Grandmother"), where they have remained since.[3]  N.T., 1/25/21, at 9-10; Orders of Adjudication and Disposition, 1/31/17.

The court conducted regular reviews where the court maintained the Children's commitment and placement, and goals.  **See** DHS Exhibits 3 and 4. On December 28, 2020, DHS filed petitions for the involuntary termination of parental rights and for a goal change.  The court held a combined termination/goal change hearing on January 25, 2021, which was conducted virtually due to the COVID-19 pandemic.  Father was present virtually and represented by counsel.  The Children were represented by a guardian *ad*

_____

dated and entered January 25, 2021.  Neither Mother nor any unknown father appealed these decrees or the goal change orders, nor were they a participating party in the instant appeals.

[2] As explained by Community Umbrella Agency ("CUA") Case Manager, Tawanda Sewell, "[The Children] were known to DHS due to lack of supervision, not well cared [for], and was [sic] unsupervised and was [sic] dirty and wasn't [sic] parent-controlled or supervision for these kids, and that's why they became placed in DHS."  Notes of Testimony ("N.T."), 1/25/21, at 9.

[3] Upon review, the Children resided with Maternal Grandmother since October 2016.  Continuance Orders, 12/16/16; Continuance Orders 10/14/16. Pursuant to order of December 16, 2016, their kinship placement with Maternal Grandmother was made retroactive to October 14, 2016. Continuance Orders, 12/16/16.

*litem* ("GAL") as well as counsel, also referred to as a child advocate. DHS presented the testimony of Tawanda Sewell, CUA, Turning Points for Children, Case Manager; and Maternal Grandmother, A.B. DHS further presented Exhibits DHS-1 through DHS-4 which were marked and admitted. N.T., 1/25/21, at 6-9; Permanency Review Orders, 1/25/21. Additionally, Father testified on his own behalf.[4]

By separate decrees and orders dated and entered January 25, 2021, the court terminated Father's parental rights and changed the Children's placement goals to adoption. Thereafter, on January 31, 2021, Father, through appointed counsel, filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Pursuant to Father's motion filed March 12, 2021, this Court consolidated Father's appeals on March 15, 2021.

On February 26, 2021, the court filed a Notice of Compliance with Rule of Appellate Procedure 1925(a). **See** Trial Court's Notice of Compliance with Rule of Appellate Procedure 1925(a), 2/26/21. The court stated, in part, "The trial court's primary statements regarding the termination of parental rights appears after argument from counsel. . . ." **Id.** at 1 (unpaginated). The court continued, "Furthermore, this [c]ourt addressed the determination that it is in the best interest of the Child[ren] for a Goal Change to Adoption." **Id.** Following broad reference to the record, including witness testimony and

---

[4] While not present, Mother was represented by counsel.

exhibits presented, the court further stated, "To the extent that the Pennsylvania Superior Court believes that the trial court's statements on the record do not adequately address any issue on appeal, the trial court will submit a supplemental opinion upon remand." *Id.* at 1-2.

Pursuant to Judgment Order entered June 21, 2021, the matter was therefore remanded to the trial court for it to file with this Court, within thirty days, a Pa.R.A.P. 1925(a) Opinion providing the reasons for its decision to involuntary terminate Father's parental rights and change the Children's permanent placement goal. We further directed the trial court to address the issue raised by Father in his Rule 1925(b) Statements related to the actions of the child advocate, which he claims were violative of *In re Adoption of L.B.M.*, 639 Pa. 428, 161 A.3d 172 (2017) (plurality). The trial court filed an Opinion on July 22, 2021.

On appeal, Father raises the following issues for our review:

Whether the trial court committed reversible error when it changed the goals to adoption and involuntarily terminated [F]ather's parental rights under 23 [Pa.C.S.A. Sections] 2511 (a)(1), (2), (5), (8) and 2511 (b)[,] where such determinations were not supported by clear and convincing evidence, where DHS could not establish that the Father had been provided with a copy of his Single Case Plan [("SCP")], where the Father testified that he had completed his objectives and was ready to assume custody of his children and where the child advocate failed to provide evidence that the [C]hildren wanted Father's parental rights to be terminated and to be adopted?

Father's Brief at 7 (suggested answer omitted).

While presented as a singular issue, we view Father's challenge to the trial court's decrees and orders as containing two issues: whether the trial court erred in its Section 2511 analysis, both as to subsection (a) and subsection (b); and whether the child advocate violated **L.B.M.** We take Father's second issue as to violation of **L.B.M.** first.

As set forth in **L.B.M.**, pursuant to 23 Pa.C.S.A. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome. **In re Adoption of L.B.M.**, 639 Pa. at 440-42, 161 A.3d at 175, 180; **see also In re Adoption of K.M.G.**, ___ Pa.___, 240 A.3d 1218, 1223-24 (2020) ("As we have previously recognized, 'Section 2313(a) requires that the common pleas court appoint an attorney to represent the child's legal interest, *i.e.* the child's preferred outcome,' and the failure to appoint counsel constitutes structural error in the termination proceedings."); **see also In re T.S.**, 648 Pa. 236, 239-40, 257, 192 A.3d 1080, 1082 (2018).

Further, and more importantly, counsel is not required to place a child's preferred outcome on the record. As stated by our Supreme Court in **In re K.M.G.**, "We observe that Subsection 2313(a) simply does not require counsel to place the child's legal interests on the record. Indeed, the statutory directive is to the court, not counsel." 240 A.3d at 1227. The Court continued, stating:

We additionally reject the underlying assumption that the absence of a child's preference on the record equates to counsel's failure to ascertain the child's preferred outcome or to provide effective representation of his or her client for purposes of Section 2313(a). Children for whatever reason may understandably resist stating whether their parents' rights should be terminated and may be averse to declaring their preference between their natural and foster parents. While we recognize that it may be a best practice for a child's legal counsel to divulge the child's preferences in order to advocate for their client's preferred outcome, we find nothing in the language of the Adoption Act requiring that their preference be placed on the record, which instead only requires that the child be appointed counsel. Moreover, we observe that the child's legal counsel has a duty of confidentiality to their client, the child, such that they should not be compelled to disclose the child's preferences. We are thus wary to create a bright-line rule requiring counsel and the courts to place the children's preferred outcome on the record as we are concerned by both the potential violation of a child's attorney-client privilege and with the real specter of placing unconscionable stress on a child by mandating that her feelings regarding her parents and caretakers be made public and permanently enshrined in the record.

*In re Adoption of K.M.G.*, ____ Pa. at ____, 240 A.3d at 1237-38.

In finding compliance with *L.B.M.*, the trial court reasoned:

Father's averment that there was a violation of [*L.B.M.*] is not sound. Superior Court reversed the [t]rial [c]ourt in that case[] stating that 23 Pa.C.S.A.[ § ]2313(a) required the appointment of separate counsel to represent the [C]hildren. The [t]rial [c]ourt there erred in allowing the [GAL] to serve two roles. [The] [c]hildren in this case were appointed a [c]hild [a]dvocate and [GAL]. The [c]hild [a]dvocate advised the [c]ourt that she interviewed the [C]hildren as well as [Maternal Grandmother]. Although she did not quote what [the] Children and [Maternal Grandmother] said, she presented the desires of her clients which were not consistent with the record and this [c]ourt's findings. There is no incongruity in [the] Children's best interest and legal interest and there is no 23 Pa.C.S.A.[ § ]2313(a) issue in this case.

Trial Court Opinion ("T.C.O."), 7/22/21, at 8-9.

Father, however, argues that the child advocate failed to present evidence indicating that she had spoken to the Children as to their wishes regarding termination and adoption or any other evidence as to their wishes for that matter. Father's Brief at 23. He further notes the Children's ages and suggests that they were both old enough to in fact have such preferences. *Id.* at 23-24. Father states:

> In the instant case, while a child advocate was appointed for [the Children,] the mandate in [**L.B.M.**] was not followed. A review of the record confirms that nowhere in it did the appointed child advocate present any evidence that she had spoken to the [C]hildren about changing the goals to adoption, terminating their [f]ather's parental rights and being adopted by their [m]aternal [g]randmother. The appointed child advocate in the case at bar failed to present any witness to the [C]hildren's wishes and when it came time for her "statement[,"] as she characterized her obligation and offer of proof, she expressed to the court those factors that she believed supported an adoption and that were in the best interests of the [C]hildren.

> B.L.H., having been born [in April 2011], was 9 years and 9 months old at the time of the termination hearing. The child was clearly old enough to express and to vocalize his wishes regarding termination of his [f]ather's parental rights and about being adopted. A.A.H., having been born [in April 2012], was 8 years and 9 months old at the time of the termination hearing. She too was clearly old enough to express and to vocalize her wishes regarding termination of her [f]ather's parental rights and about being adopted. The fundamental truth with this termination hearing is that nowhere in this record were the [C]hildren's legal positions advocated by their lawyer. We simply do not know what the [C]hildren want when it comes to the question of terminating their [f]ather's parental rights and being adopted by their grandmother. The only evidence on this record about this subject comes from the CUA worker: a witness clearly favoring the side seeking termination of Father's parental rights.

> The trial court did what [**L.B.M.**] requires: appointing separate counsel as the GAL and as the child advocate. However,

the child advocate failed to fulfill her responsibility to provide evidence of what the [C]hildren wanted and to make appropriate arguments thereon. Instead of fulfilling her responsibility to her clients and her role in the case, the child advocate merely presented the identical evidence and arguments of the GAL. As a result, the constitutional rights of these children to due process under the law were violated. Instead of being provided with an advocate for their legal wishes, they were provided with the functional equivalent of no counsel where their legal counsel merely parroted the arguments of the GAL. For this reason alone, the changes of goal and the termination of Father's parental rights should be vacated and the matter should be remanded to a replacement judge who has not already made a determination and for appointment of a new child advocate to present evidence and to make arguments consistent with what the [C]hildren want.

*Id.*

Upon review, Father's claim fails. With her statement on the record, the child advocate noted that she visited with the Children. N.T., 1/25/21, at 54 ("Your Honor, I did have an opportunity to visit virtually with the [C]hildren, both [A.H. and B.H.], as well as have a conversation with their grandmother, Ms. [B.], who has just testified.").

Critically, there is no indication that counsel did not in fact speak with the Children and that her assessment does not reflect their desires as to termination and adoption by their grandmother. In fact, testimony of the CUA Case Manager, Tawanda Sewell, as to the Children's wishes to be adopted by their grandmother supports counsel's statement and position. *Id.* at 21. Ms. Sewell confirmed that she spoke with the Children and they would like to be adopted by Maternal Grandmother. *Id.* ("Yes, they -- they would like to be adopted by grandmother."). Moreover, counsel was not required to place the Children's wishes or preferred outcome on the record. *See In re Adoption*

*of K.M.G.*, ___ Pa. at ___, 240 A.3d at 1237-38. As such, Father's claim lacks merit.

Turning to Father's remaining issue related to the trial court's determinations as to Section 2511, in matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013)). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004)

- 11 -

(*en banc*). Here, we analyze the court's termination decree pursuant to Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

- 12 -

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." ***In re Adoption of C.D.R.***, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting ***In re A.L.D***., 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***In re A.L.D***., 797 A.2d at 340 (internal quotation marks and citations omitted).

Instantly, in finding grounds for termination of Father's parental rights under Section 2511(a)(2), the trial court stated:

> A.A.H. and B.L.H., [the] Children[,] were born [in April 2012 and April 2011]. [The] Children have been in care for years. SCP objectives were established for the family. Despite being given ample opportunity, Father failed to produce evidence of complying with his objectives as well as refused and failed to perform his parental duties. He expressed that he did not come forward to get his children back until he received a subpoena for the TPR [("Termination of Parental Rights")] hearing. Father stated that he was fine with [Maternal Grandmother]'s care and that she could continue to care for them. He simply did not want his rights terminated. In alignment with Father's desire not to parent his children, [Maternal Grandmother] testified that Father told her she could adopt the [C]hildren if she did not change their last name. This testimony was not rebutted. Father's actions demonstrate that he has no desire to parent [the] Children. He is satisfied with stopping by on occasion while [Maternal Grandmother] cares for

- 13 -

[the] Children and provides for their daily needs. He has relinquished his parental duties to her. His actions caused [the] Children to be without essential parental care, control or subsistence necessary for their well-being.

T.C.O., 7/22/21, at 7-8 (citations to record omitted).

Father, however, argues that he made progress with his objectives, with no abuse, neglect, or lack of care. He indicates that he was merely allowing the Children to reside with Maternal Grandmother through a family arrangement, as they were happy. Father's Brief at 28.

In the instant case, [] Father obtained housing, completed parenting classes[,] and was self-employed. He engaged in no abuse or neglect of his children. Neither [sic] did he cause the [C]hildren to be without the essential parental care or subsistence necessary for the [C]hildren's physical or mental well-being. He permitted the [C]hildren to reside with the grandmother because the grandmother and the children were happy with the family arrangement.

*Id.*

Father further maintains that the trial court erred with respect to its credibility determinations. *Id.* at 25-27. Specifically, Father alleges that the testimony of the CUA Case Manager, Ms. Sewell, was equivocal and not credible, and should not have been believed over his own testimony. *Id.*

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). The record reveals that Father failed to complete his goals aimed at reunification. CUA Case Manager, Tawanda Sewell, recounted that Father's goals included compliance with his parole

officer;[5] obtaining housing; completing parenting class; maintaining employment; and maintaining contact with his children through visitation. N.T., 1/25/21, at 15-16, 31. Ms. Sewell stated that she and Father spoke regarding his goals. *Id.* at 34-35 ("When I first met, me and dad talked about that we need to see housing and what he got to do, and his parole, yes, we did talk about that."). She, however, testified that Father did not complete or failed to present proof of completion of any of such goals. *Id.* at 17-18, 37-39.

While the agency referred Father to the Achieving Reunification Center ("ARC") for completion of parenting class, housing, and employment, Ms. Sewell reported that Father failed to complete any objectives through ARC. *Id.* at 17-18, 39. Although Father reported appropriate housing to Ms. Sewell, at the time of the hearing, Ms. Sewell explained that she had not yet been able to assess his home. *Id.* at 35-36 (". . . [Y]eah, dad informed me that he had appropriate housing, that he got his own house, yes. That's [sic] he told me. But I never went out -- I didn't ever get a chance to go out to get to meet, to see that house.").[6] Further, as to employment, despite claims of

_____

[5] Father indicated that he was incarcerated for five to six months in 2019. *Id.* at 66-67. Further details as to the circumstances of Father's incarceration, *i.e.* charges, are unclear from the record.

[6] Ms. Sewell testified to efforts at assessing Father's home. *Id.* at 16-17 ("Yes. I did try to schedule a visit when I met with dad. When I saw him in person, I -- at court—the first time we had court, I tried to met (sic) with him to see if he has housing, and the last time, I think, when I spoke to him, I
*(Footnote Continued Next Page)*

- 15 -

self-employment, Ms. Sewell indicated that Father failed to present any proof. *Id.* at 18, 37-38 ("Father told me that he's employed but he never gave me documents.  He said he's self-employed, but he never gave me proof of his owning a business or he's -- anything.  But he told me that he worked for himself, he's a contractor, but he never provided any documents.").  Similarly, Father claimed completion of the required parenting classes for which he was referred and that he provided certification to CUA.  *Id.* at 57-58, 69-72.  Again, Ms. Sewell, however, indicated a lack of proof or documentation.  *Id.* at 38.  Lastly, Father only had fifteen to twenty visits with the children over the year preceding the hearing.[7]  *Id.* at 51-52.

For these reasons, as well as those indicated by the trial court, we discern no abuse of discretion.  The record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for her physical and mental well-being.  *See In re Adoption of M.E.P.*, 825 A.2d at 1272.  Moreover, Father cannot or will not remedy this

---

wanted to set up the meeting (inaudible) so, did try (unintelligible) to go meet with dad.").  She noted requesting to see the home as recently as her last conversation with Father in November 2020.  *Id.* at 16-17, 32, 37.

[7] As to the frequency of Father's visitation with the Children, Maternal Grandmother described, "At first[,] it was, like, twice a month, then it got down to once a month, sometimes not even in a month, but he's welcome to see them at any time."  N.T., 1/25/21, at 48.  She conceded that the visitation is unsupervised.  *Id.* at 40.

situation. ***See id.*** As we discern no abuse of discretion or error of law, we do not disturb the trial court's findings.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa.Super. 2006).

As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). ***In re B.L.W.***, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa.Super. 2012). In ***In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]***, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791. However, as

- 17 -

discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In determining that termination of Father's parental rights favors the Children's needs and welfare under Section 2511(b), the trial court stated:

Upon finding that DHS met its burden under [Section] 2511(a), the [c]ourt considered [Section] 2511(b). The court

- 18 -

found that the evidence supported that it would be in the best interest of [the] Children to severe [sic] the legal parent-child relationship. Here[,] the [c]ourt focused on a needs and welfare analysis in making its decision. [*In re I.G. and J.G.*, 939 A.2d 950 (Pa.Super. 2007)]. The testimony is clear that the [C]hildren have a bond with [Maternal Grandmother]. They look to her for love, support and to ensure that their needs are met. Neither child looks to Father as a parent. On the contrary, they want to be adopted by [Maternal Grandmother].

When asked whether [the] Children would be irreparably harmed if Father's rights were terminated, the CUA Case Manager opined that they would not. When asked why, she stated, "Because I know they're safe with grandmother and they tell me for theirself (sic). So, I know they will—won't be harmed if dad's rights are terminated." She replied, "Yes[,"] when asked if it would be in [the] Children's best interest to be adopted. The [C]hildren told her that [sic] wanted to be adopted and her observations of the [C]hildren with [Maternal Grandmother] supported her position.

T.C.O., 7/22/21, at 8 (citations to record omitted).

Father, however, argues that the trial court's determination was flawed given the child advocate's failure to comply with *L.B.M.* and present evidence of the Children's wishes as to termination and adoption. Father's Brief at 29-30. Father states:

In the case at bar, the [c]ourt did give consideration to the developmental, physical and emotional needs and welfare of the [C]hildren, however, this judgment was an abuse of discretion as the judgment was manifestly unreasonable because the law, as stated in [*In re L.B.M.*, *supra*], was not applied. Without evidence from the [C]hildren's advocate regarding what the [C]hildren really want with regard to terminating Father's parental rights and being adopted by the grandmother, we cannot know what is in the best interest of the [C]hildren's physical, and emotional needs and their welfare.

*Id.*

As to Section 2511(b), upon review, we likewise discern no abuse of discretion. For the reasons expressed by the trial court, the record supports the trial court's finding that the Children's developmental, physical and emotional needs and welfare favor termination of parental rights pursuant to Section 2511(b). *See T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

While Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. At the time of the hearing, the Children had resided with Maternal Grandmother for four years, and were entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Lastly, we turn to the question of whether the trial court appropriately changed the permanency goal to adoption. In so doing, our standard of review is the same abuse of discretion standard as noted above. *See In the Interest of L.Z.*, 631 Pa. 343, 360, 111 A.3d 1164, 1174 (2015) (citing *In re R.J.T.*, 608 Pa. at 26-27, 9 A.3d at 1190, for the proposition that the abuse of discretion standard applies in a dependency matter); *see also In re S.B.*,

943 A.2d 973, 977 (Pa.Super. 2008) ("In cases involving a court's order changing the placement goal from "return home" to adoption, our standard of review is abuse of discretion.")

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

***In re A.B.***, 19 A.3d 1084, 1088-89 (Pa.Super. 2011) (citations and quotation marks omitted).

Additionally, § 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . . .
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

Father likewise challenges the trial court's goal change orders. For the reasons we have already discussed throughout this memorandum, the record confirms that changing the Children's goals to adoption is in their best interest. **See A.B.**, 19 A.3d at 1088-89.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b), and changed the Children's permanent placement goals to adoption.

Decrees and orders affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

*Judgment Entered.*

_Joseph D. Seletyn, Esq._
*Prothonotary*

*Date: 9/16/2021*